## JACOB H. GRIFFIN, Respondent v. MINNIE P. GRIFFIN, Appellant.

Divorce — Adultery — Sufficiency of Evidence — Alimony— Rule for Allowance of—Custody of Minor Child—When Party in Fault Should be Allowed to See Child.

*Divorce—Adultery—Proof.*

Adultery may be proven in a divorce case by circumstantial evidence.

*Alimony—Rule for Allowance of.*

Dissolution of a marriage by divorce being analogous to its dissolution by death, a general rule for the allowance of alimony is the customary one-third of the husband's property, or one-third of his income.

*Custody of Minor Child — When party in fault should be allowed to see child.*

When the evidence shows plaintiff guilty of desertion and adultery; that he falsely charged defendant with drunkenness, with visiting opium dens, and with adultery; that he used opprobrious language towards her and caused her to be knocked down and otherwise maltreated by his agent; and the evidence further shows that defendant's parents reside outside the state, and that the best interests of a child, the custody of which is awarded defendant, may demand defendant should return to her parents, defendant should be allowed to take the child outside the State, and plaintiff should be allowed only to visit the child in an orderly manner, at reasonable times and in defendant's presence.

(Decided November 29, 1898.)

Appeal from the district court of Salt Lake county, Hon. Ogden Hiles, *Judge.*

Action by plaintiff against defendant for divorce.

Defendant answered and cross-complained. From a judgment granting defendant a divorce on one ground in

the complaint and awarding her certain alimony.  Defendant appeals.  Modified.

*Messrs. Young & Moyle*, and *Messrs. Moyle, Zane & Costigan*, for appellant.

That the allowance of alimony is grossly disproportionate under the facts in this case, see:  2d Am. & Eng. Enc. of Law, 2d ed., 120–125; 2d Bishop on Marriage and Divorce, Secs. 1028–1037.

Under the evidence the sole care, custody and control of the child should have been given to the defendant untrammeled by any restrictions.

*Messrs. C. F.* and *F. C. Loofbourow*, and *Messrs. Richards & Richards*, for respondent.

The rule which should govern the court in awarding the custody of the child is laid down in the statute.  2 C. L., 1888, Sec. 2546.

The books are full of adjudications to the effect that a wife under circumstances as in this case is not entitled to much consideration in the way of alimony.  Am. & Eng. Enc. of Law, 2d ed., Vol. 2, p. 21, and cases cited; *Zuver* v. *Zuver*, 36 Iowa, 190, and cases cited.

## STATEMENT OF THE CASE.

This is an action for divorce.  The plaintiff alleged in his original complaint that the defendant was an habitual drunkard; that she had been guilty of cruel treatment of him; and that she was unfit to have the custody of their minor son, and prayed for a decree of divorce and for his custody.

. The defendant answered and filed a cross-complaint denying plaintiff's allegations, and alleged that he had

been guilty of cruel treatment of ner; that he had at various times and places committed adultery with one Cora E. Berkman; that he was not a fit person to have the custody of their child; that he was worth $60,000, and in receipt of an income of not less than $6,000 per year; that the plaintiff had seized the child, and caused the defendant to be cruelly assaulted, knocked down and beaten by one of his employes when she sought to regain his possession.

The cross-complaint also prayed for a divorce, temporary and permanent alimony, suit money, counsel fees, and the custody of their child. The day the cause came up for trial, plaintiff amended his complaint, and charged defendant with adultery. The defendant answered, denying the amendment, and afterward amended her cross-complaint and charged plaintiff with deserting her and her child, and plaintiff answered denying the amendment, and admitted that he was worth $14,000.

The court below, upon the admissions of the parties, and the evidence, and after finding that the parties were married in Louisville, Kentucky on the 4th day of January, 1888, and that they had resided in Salt Lake County, Utah, for one year next preceding the commencement of the suit, found that the defendant had not been at any time an habitual drunkard or guilty of cruel treatment of the plaintiff to the extent of causing great bodily injury or great mental distress, or of adultery; also found that plaintiff had not been guilty of cruel treatment of defendant to the extent of causing her bodily injury or mental distress, or of adultery.

The court further found that on or about the 10th day of June, 1896, the plaintiff, without legal cause or excuse, wilfully deserted the defendant, and has ever since refused to live or cohabit with her; that there was born to the

plaintiff and defendant one son aged eight years, then living with the defendant; that the welfare of the son would be best subserved by giving defendant his custody until he should arrive at the age of fourteen years, but that the defendant should not be allowed to take said son out of the State of Utah, without the consent of the plaintiff entered upon the minutes of the court; that the plaintiff should at all reasonable times and places be at liberty to visit and associate with his son without molestation, and without the presence of the defendant; that the plaintiff should also have the right, during one day of each week, to take the child with him for the purpose of exclusive association and visit with the child away from home, but on all such occasions such child should be returned to his mother before night; that the defendant should have as permanent alimony all the right, title and interest of the plaintiff in their homestead property then occupied by the defendant; that plaintiff should also convey to her all his interest in the horse, harness and cart now in defendant's possession, also the household, kitchen and other personal property in the house, except the personal clothing of the plaintiff, and the personal books, pictures, private papers and presents; that the property should be taken by defendant in full satisfaction of her interest, whether of dower or otherwise, of the property of plaintiff which he then had or may thereafter acquire, and in full satisfaction of all demands of every kind and description against him, except for the support of the child, thereafter mentioned in the findings; that the plaintiff should pay to the defendant for the maintenance of his son Harvey P. Griffin until he shall arrive at the age of fourteen years, the sum of $1440, said sum to be paid in equal quarterly instalments of $60 each, at the end of each quarter year until the whole is paid, but in case of the death or change of custody of said child, such payments shall thereupon cease.

The court further found that the plaintiff should pay the legally taxable costs in the case, and that he should also pay the defendant's attorneys, for their services, the sum of $500; in addition to the sum theretofore allowed, and that this sum should be paid on or before the 10th day of December, 1897, and when so paid said sums should be in full satisfaction for said services and all costs.

The court stated its conclusions of law, and entered its decree in accordance with the above findings.

The defendant appeals from so much of the decree as adjudged the plaintiff had not been guilty of adultery, and that the defendant should not take said Harvey P. Griffin out of the State of Utah, without the consent of the plaintiff thereto entered upon the minutes of the court, and so much as gives the plaintiff the right to take the child from defendant's custody at certain times, and that part of the decree fixing the alimony of defendant, and the amount to be paid defendant for the support of the child, and all that part of the decree which gives defendant only her legally taxable costs less the $500 allowed as temporary suit money.

The defendant assigns as error the finding of the court that the plaintiff had not been guilty of adultery, for the reason that the evidence in the case showed that he had been, at the time stated in the defendant's cross-complaint, guilty of adultery with Cora E. Berkman.

It appears from the evidence in the record that before the plaintiff deserted his wife he met Cora E. Berkman the first time, who had been divorced and had resumed her maiden name, upon the train on the way to California; that she was a young woman between 21 and 25 years of age, and attractive; that they traveled together to Los Angeles; that they again met in Passadena, where he

called on her a few times, how often does not appear; that they went horseback riding together, and at another time in a carriage; that she was at the depot when he left for Salt Lake City; that she afterwards came to Salt Lake City herself; that he showed her and her sister, who was with her, about the city; that she saw him again as she was leaving the city; that she went away and afterwards returned in July 1896; that Griffin had then ceased to live with his wife and child and was rooming at the Sanitarium; that he met her at the Sanitarium one evening and she saw him again on the street and asked him if he knew of a flat, she afterwards saw him at the Sanitarium and asked him to call; that Griffin informed her he was living down town, she stated she had a couple of rooms and asked Griffin to take one, and a few days after he took it, but only occupied it of nights; that a portion of the time he also had rooms at Mrs. Snelgrove's and Miss Berkman's, he slept a part of the time at one place and a part at the other; that he occupied a room of Miss Berkman's a couple of months, and left the house when she did and went back to live at Mrs. Snelgrove's; that when his month was up he took a room of Miss Berkman in the Harmon block, she having moved there. He also roomed with Miss Berkman on First street two months. When Miss Berkman moved to the Harmon Block, Griffin came to the rooms with a package and one of the women said they were so glad that he had come with something to eat. It appears that Griffin was there every day from the first. He would come in the evening and go in the morning, and would go in the house without knocking, and took meals with Miss Berkman and another woman, and took the women out driving in the Canyon, and took them to the lake; that Miss Berkman took but two rooms, 315 and 316 and Griffin occupied 316, and Miss Berkman occupied 315 with Mrs. Shadle and her child

for a time; that there were doors between these rooms which were not fastened and often opened. After Mrs. Shadle left Mrs. Erickson came and occupied the room with Miss Berkman. This Mrs. Erickson, according to those well acquainted with her, was an unchaste woman; that her character was bad; that afterwards a Miss Bach came there; that before she left a Miss Hesenault came, and the three women occupied 315 together at one time.

It further appears that a Mrs. Thurston, who occupied room 314, moved out at Miss Berkman's request, and she gave that room to Griffin, and they so continued their occupancy until Jan. 21, when they left; that a portion of the time Griffin took his meals with Miss Berkman.

It further appears that Mrs. Erickson was occupying the same room and bed with Miss Berkman, and she refused to answer as to her situation in life, but admitted that she was separated from her husband, and she refused to answer questions asked her as to her conduct towards a certain mining man, who it seems was intoxicated at the place and was turned out by the landlady. It seems she was living there while her husband and father were still living in the city, and it appeared that she was disowned by some of her family.

There was also evidence tending to prove that Miss Berkman was a woman of ill repute. It seems that Miss Berkman was called "Doll" by Griffin, and that he was by her called "Pop."

Mrs. Thurston, who roomed at the Harmon Block testified that one evening she passed up the hall and looked into the room and saw Griffin sitting on his bed, and Miss Berkman was sitting in his lap with her night robe on, and that she came back a while later and they were still sitting there; that on another occasion Miss Berkman came out of her room and went into Mrs. Thurston's room

with nothing on but her chemise, and then went back into the room in the same attire; that Griffin was there, and she heard them having "lots of fun"; that Mrs. Thurston gave up her room at Miss Berkman's request, because Griffin wanted a room at that end of the building; that she saw Griffin working around the stove sometimes in the morning getting his own breakfast. It appears that at one time there were in these two rooms two men and three women.

Mrs. Thurston also testified that she saw them in the room indulging in "high kicking." Miss Berkman admitted she was taking lessons in fancy dances and high kicking. The same witness testified that those people were not respectable, and she adhered to her statements on cross-examination. She further said that she admonished Miss Berkman because she did not like to live in a block with such people.

Mrs. Clump also testified that she saw Miss Berkman sitting in Griffin's lap with her arms around his neck, and saw Griffin carrying water and wiping dishes for Miss Berkman; that Miss Berkman showed her and Mrs. Perkins a diamond ring that she said Griffin gave her. She stated further that Miss Berkman's and Mr. Griffin's clothes went to the laundry together, and that his clothes were marked with the letter " B," and it appears that she got money from Griffin to pay the laundry bill. It was also stated by one witness that Miss Berkman said " I am going to the hospital. If I am in a family way it is by Griffin "; that she did go to the hospital, and while there Griffin sent her flowers, with a note signed "Your affectionate Pop."

It further appears that Miss Berkman moved to No. 11 East Third South Street, and kept house there; that Mrs. Erickson and Griffin were there; that Mrs. Griffin found

her husband there, was refused admission at first, and was told that Griffin was not in, and finally got a police officer and got in; that the first thing Griffin said when they got in was "You can't arrest me tonight." What occurred in the rooms is given with a good deal of particularity.

It further appears that Mrs. Griffin got him a nurse, but the Doctor ordered him to the hospital, and Mrs. Griffin was denied admission there. She afterwards entered the room and Miss Berkman was there sitting along side of the bed. Mrs. Griffin ordered Miss Berkman out, and Griffin cursed his wife.

It appears further that Miss Berkman went to Ogden and there became sick and sent for Griffin to come up, and he went to see her there. It seems they afterwards met in Denver, and that she came back to Salt Lake City, and stayed with a family named Tracy, and that Griffin went to see her there.

Miss Berkman and Mr. Griffin both denied any misconduct on their part. Miss Berkman offered evidence tending to show that during a portion of the time she was sick, troubled with female weakness as she termed it, but a portion of the time she was taking dancing lessons. She admits that she was taking dancing lessons, but not during the month of November. She stated she was taking dancing lessons from Landrum, and she afterwards admitted that she took lessons on the 24th day of November, and other days. Some two or three doctors were called who said they attended her a portion of the time, and that she would not be likely to desire sexual intercourse in the condition in which she was. Miss Berkman offered some evidence to show that she was a woman of good character.

PER CURIAM.

The fact that the plaintiff, a married man, met Miss Berkman, who was a stranger to him, on a railway train and went to Los Angeles with her and afterwards followed her to Passadena, and there called on her several times, how many does not appear, took her out driving in a carriage and also on horseback, and that she was at the railway station at the former city to bid him good bye when he started home is very unusual conduct for a well-meaning married man, and especially so when the strange woman has been divorced from her husband, and is young and attractive.    Such conduct casts a shadow upon their associations, intercourse and intentions.    The fact that she stopped over in Salt Lake City, where he resided, and they met again and he showed her about the city, and after returning home to St. Paul, Minnesota, she again returned to Salt Lake and met him at the Sanitarium, where he was rooming, he in the meantime having deserted his wife and child, throws further suspicion upon them; and the further facts that they thereafter went to the same house occupying bedrooms with an unfastened door between them the most of the time, until he determined to sue for divorce and commenced preparing for a trial, and that he followed this woman up wherever she moved, boarded and ate with her; that they were seen in very compromising positions in his bedroom; that she sent his clothes to the laundry with hers, with the same mark upon them, and her statement that she was going to the hospital, and if she was in a family way it would be by plaintiff, and the fact that most of the time she was living and sleeping in the same bed with another who was not living with her husband, and whose reputation for chastity was bad, and that Miss Berkman's reputation was also bad, (as to this latter fact, however, there

was a conflict in the evidence) with all the other evidence in the case leaves no room for a reasonable belief that the plaintiff did not commit adultery as charged by his wife in her cross-complaint. It is true Miss Berkman denies, under oath, that she was seen in the compromising positions to which the witnesses testified, and denies the statement "If she was in a family way it would be by Griffin," and it is true that both deny there was at any time illicit intercourse between them. It is also true that some other witnesses testified in their behalf. But the statements of plaintiff and Miss Berkman must be weighed in the light of their motives to prevent disgrace and defeat in a lawsuit and to exculpate them of a crime which might subject the plaintiff to confinement in the penitentiary for the term of three years, he at the time being married, and the woman to confinement in the county jail for the term of six months, she being an unmarried woman. The statements of plaintiff with the penitentiary before him, and those of Miss Berkman face to face with the county jail, and both with impending humiliation and disaster in case of defeat hanging over them, their denials can be given but little weight, as we think.

We fail to find from the evidence any sufficient motive to induce the witnesses, who stated the most damaging facts against them, to testify falsely, and in the light of all the other evidence, their statements do not appear to be unreasonable.

We are of the opinion, therefore, the court below erred in finding the plaintiff was not guilty of adultery with Cora E. Berkman, as alleged in defendant's cross-complaint.

The defendant has not appealed from the finding that the plaintiff was guilty of cruel treatment of defendant, though it is assigned as error, and was discussed by coun-

sel in their arguments. We will not consider the evidence bearing on that charge further than is deemed proper to notice it in deciding the other issues.

The finding of the court, to so much of the decree as grants alimony to the defendant, is assigned as error. A general rule by which to determine the amount of alimony to be allowed the divorced wife is laid down in Sec. 1029, 2 Bishop on Marriage, Divorce and Separation, as follows: "The dissolution of a marriage by divorce is analogous to its dissolution by death. A judicial separation from bed and board is partly so. In a sort of general way with variations after which it is not needful here to inquire, the common law gives the widow on the death of the husband one-third of his estate. So that, looking at this sort of analogy, if one-third of the husband's income will leave the wife on divorce as well off pecuniarily as though the cohabitation continued, with something in compensation for her injury, such, when not reduced by a separate income of her own, may well be regarded as a sort of common, matter-of-course proportion."

This is a general rule deduced from a consideration of the authorities by the author. The amount should be varied, however, in view of peculiar facts and circumstances. Conceding the admission of plaintiff that he is worth $14,000 (which in view of the evidence is a low estimate) according to the rule $4,666 should have been awarded the defendant on the basis of a gross sum; or on the basis of plaintiff's net income, fixed by himself at $1,200 (which, from the evidence, we also think is a low estimate) defendant should have been allowed $400 per annum. The findings and decree gave her their homestead which the plaintiff valued at $3,500, with an incumbrance on it of $2,500. That would amount to only $1,000, and the title of this property is in the Deseret Savings

Bank. · The court also allowed her a cart, horse and harness, and the household furniture, the value of which the evidence does not enable us to fix precisely.    Second-hand furniture is worth much less than new.    The entire alimony allowed the  defendant is probably less than $2,000, when  she should have been allowed $4,666, on the basis of a gross  sum, or $400 per annum, on the basis of plaintiff's income.

The $240 per annum, allowed by the court for the support, nurture and education of his infant son cannot be regarded as alimony for the benefit of defendant.    It is plaintiff's legal duty to pay for the support and education of his child; but in case he shall elect to live with his mother after he may legally chose for himself, the father should continue to pay for his support and education until he is brought up and educated, and that will not be accomplished by the time he is fourteen years of age— probably not before he is eighteen.    The decree does not require the plaintiff to pay for such support and education after his son is fourteen.

We are of the opinion the court erred in its allowance of alimony to the defendant.    The court should have required the plaintiff to pay defendant $2,500 in addition to the homestead, the furniture, horse, harness and cart given her by the decree.

The defendant assigns as error, so much of the findings and decree as forbids the defendant from taking her son beyond the limits of this State.

It appears from the evidence that defendant's parents reside in the State of Iowa, where she lived until recently. Her welfare, and the best interests of the child might demand a return to her parents and friends there, though outside of the State.

We are of the opinion that so much of the findings, conclusions of law and decree as forbids her from taking her

son beyond the State, without the consent of the plaintiff is erroneous. We are also of the opinion that so much of the findings and decree assigned as error as authorizes the plaintiff to take defendant's son, whose custody was given her by the decree, without her consent away from her home and where he may chose, so he return him during the day, and as allows the plaintiff, without her consent, to take the child out of her presence and associate and converse with him out of her hearing was erroneous, in view of the fact that plaintiff had charged her falsely, as appears from the record and evidence, with habitual drunkenness, and with visiting opium dens, and of the fact that on the day the case was set for trial he filed an amended complaint charging her falsely with the crime of adultery with different men, and in view of the evidence that plaintiff at one time placed the child in the custody of an agent who knocked her down and otherwise maltreated her when she attempted to regain the custody of him, and in view of plaintiff's desertion of his wife and child, and his association with women of bad repute, and of his adulterous relations with one of them, as we have found, and of the fact that when she implored him to return to his family he refused to do so and abused her and applied opprobrious language to her. The court might authorize the plaintiff, in an orderly manner, to visit and converse with his son at reasonable intervals and at proper times we have no doubt.

We find no further error in this record. The cause is remanded with costs against plaintiff, and the court below is directed to change the findings, conclusions of law and decree so that it shall conform to this opinion.