## LILLIAN H. LEMP, Appellant, v. WILLIAM J. LEMP, JR.

### In Banc, April 8, 1913.

1. **MOTION FOR NEW TRIAL: Judgment Modified: Appeal.** The fact that a judgment has been modified in a matter not contended for in the motion for a new trial, does not necessitate the filing of another motion for a new trial in order to preserve for appeal the points embraced in the original motion.

2. **DIVORCE: Alimony: Annual or In Gross: Appeal.** A judgment of the circuit court allowing alimony at the rate of $6000 a year while the divorced woman should remain unmarried, is modified so as to award $100,000 alimony in gross—the husband's wealth reaching beyond a million dollars, but consisting mainly of stock in close corporations, controlled by those who might become inimical to the divorced woman.

Appeal from St. Louis City Circuit Court.—*Hon. George C. Hitchcock*, Judge.

REVERSED AND REMANDED (*with directions*).

*Daniel Dillon, W. C. Marshall* and *Leahy, Saunders & Barth* for appellant.

(1) Innumerable decisions of the courts of other States might be cited wherein alimony in gross was granted.  Horning v. Horning, 107 Mich. 587; Jeter v.

Jeter, 36 Ala. 391; Hyatt v. Hyatt, 33 Ind. 309; Williams v. Williams, 6 S. D. 284; Minehan v. Minehan, 145 Wis. 514; Vey v. Vey, 229 N. W. Rep. 801; Tuttle v. Tuttle, 128 N. W. Rep. 695; Griffin v. Griffin, 18 Utah, 98; McChesney v. McChesney, 91 Wis. 268; Roelke v. Roelke, 103 Wis. 204; Walton v. Walton, 57 Neb. 103; Thornberry v. Thornberry, 5 Littlell (Ky.) 251; Calame v. Calame, 24 N. J. Eq. 440; Walston v. Walston, 126 N. W. 145; Boggs v. Boggs, 90 N. E. 1040; Robson v. Robson, 126 N. W. 216; De Ruiter v. De Ruiter, 28 Ind. App. 9; Ferguson v. Ferguson, 145 Mich. 290; Inskeep v. Inskeep, 5 Iowa, 204; Heist v. Heist, 48 Neb. 794; Hamilton v. Hamilton, 37 Mich. 603; Segelbaum v. Segelbaum, 39 Minn. 258; Bialy v. Bialy, 133 N. W. 496. (2) The trial court erred in overruling the motion of plaintiff to be allowed suit money to cover the expenses of prosecuting her appeal from the judgment of the circuit court to the Supreme Court. The circuit court had the power to award plaintiff suit money to prosecute her appeal, and it erred in refusing to do so. Viertel v. Viertel, 99 Mo. App. 717; State ex rel. v. Court of Appeals, 88 Mo. 138. The wife is entitled to alimony and suit money so long as the litigation continues. State ex rel. v. Seddon, 93 Mo. 522; Bishop on Mar. & Div., 384 and 387; Rosenfeld v. Rosenfeld, 63 Mo. App. 411; Blackmeister v. Blackmeister, 106 Mo. App. 390; Libbe v. Libbe, 138 S. W. 688. Some courts at one time entertained the same idea that the trial court did in this case, viz.: that the court could not consistently allow money to pay the expenses of an appeal from its own decision. But, after further reflection, those courts concluded that their first impressions were wrong. Rosenfeld v. Rosenfeld, supra. The appellate courts correct errors of this kind, in like manner, as other errors, and either make the allowances themselves or reverse or remand the case with instructions. State ex rel. v. Court of Appeals, 99 Mo. 223; Watkins v. Watkins, 66 Mo. App. 471.

On the hearing of this motion for suit money to cover expenses of her appeal, plaintiff examined seven reputable and experienced lawyers of the St. Louis Bar, and they testified that a reasonable fee for attorneys in preparing plaintiff's appeal and properly presenting it in the Supreme Court was $5000. Defendant did not cross-examine these witnesses, nor did he offer any testimony in his own behalf on this question. The court should have allowed plaintiff on this motion for suit money $5000 to cover fees of counsel, and, in addition, a sum sufficient to pay for printing abstract and brief.

*Lehmann & Lehmann, Morton Jourdan, Edward C. Crow, W. B. & Ford W. Thompson* and *Schnurmacher & Rassieur* for respondent.

(1) Whatever may be the policy in other jurisdictions as to permanent alimony, in Missouri it is discretionary with the court whether the award shall be in gross or from year to year. The policy of this State has been declared by statute. "Upon a decree in favor of the wife, the court may, in its discretion, decree alimony in gross or from year to year." Sec. 2376, R. S. 1909. But, independent of statute, it is not the rule to allow the wife permanent alimony in gross, rather than in installments, although there are some authorities to that effect. "At the present time the practice seems to be to award alimony, either in gross or in installments, according to the circumstances of the case," etc. 14 Cyc. 777, 778, and cases. "Where the allowance of a gross sum is discretionary with the court, it has been said that unless there are special reasons to the contrary, an annual allowance, to be held under the control of the court, is the better mode of decreeing alimony." Von Glahn v. Von Glahn, 46 Ill. 134; Lake v. Bender, 18 Nev. 408; 3 Cyc. 91. (2) The amount of alimony to be awarded is within the sound judicial discretion of the trial court. 2 Am. & Eng. Ency. Law, 120; 14 Cyc. 769, 773; 3 Cyc. 211; Viertel v.

Viertel, 212 Mo. 575; Gussman v. Gussman, 140 Ind. 433. (3) And there is no fixed rule which governs. Each case must be determined on its own facts. The usual factors are the fair and reasonable needs of the wife for her support and maintenance, her age and expectation of life, the number of dependent children, the financial ability of the husband, whether the wife brought or contributed to his fortune, and whether her conduct conduced to his fault. 14 Cyc. 775, 779; 2 Am. & Eng. Ency. Law, 120, 125, 127; 3 Cyc. 77, 88; Andrews v. Andrews, 69 Ill. 612; Hedrick v. Hedrick, 28 Ind. 294; McGee v. McGee, 10 Ala. 490; Farley v. Farley, 30 Iowa, 353; Burr v. Burr, 7 Hill (N. Y.) 207; Beall v. Beall, 80 Ky. 675; Richmond v. Richmond, 2 N. J. Eq. 92; Smith v. Smith, 19 Neb. 715; Schafer v. Schafer, 10 Neb. 472; Webster v. Webster, 64 Wis. 441; Zuver v. Zuver, 36 Iowa, 198; Helden v. Helden, 7 Wis. 296; Irwin v. Irwin, 105 Ky. 632. (4) The determination of the amount of alimony, and whether it shall be in gross or from year to year, being within the discretion of the trial court, that discretion will not be interfered with, unless there has been a clear, manifest or arbitrary abuse of that discretion. And, as in equity cases, while an appellate court has the right of review, it will defer largely to the findings of the lower court, and will set its action aside only upon a strong showing. 14 Cyc. 770, 803; State ex rel. Gercke v. Sedden, 93 Mo. 523; Powell v. Powell, 53 Ind. 517; Gussman v. Gussman, 140 Ind. 433; McCarthy v. McCarthy, 143 N. Y. 240; Lake v. Bender, 18 Nev. 361; Joliff v. Joliff, 32 Ill. 527; McGee v. McGee, 10 Ala. 491; Dickens v. Dickens, 38 Ga. 671, Breinig v. Breinig, 26 Pa. St. 161; Wilde v. Wilde, 37 Neb. 898; Robinson v. Robinson, 7 Humph. (Tenn.) 440; Schlosser v. Schlosser, 29 Ind. 485; Stewartson v. Stewartson, 15 Ill. 145; Baker v. Baker, 79 Ill. 532. (5) The granting of suit money to the wife, to appeal from a decree in her favor, on the ground that the alimony awarded

is insufficient, is entirely within the discretion of the trial court; and no allowance need be made if the appeal appears to it to be without merit. 14 Cyc. 766; 3 Cyc. 144; 2 Am. & Eng. Ency. Law, 110; Rosenfeld v. Rosenfeld, 63 Mo. App. 411. Moreover, in this case appellant was allowed, and in June, 1908, received $3000 suit money. Her motion for additional suit money, not alleging that the $3000 already paid her had been fully expended or was inadequate, and no evidence having been offered, the ruling on the motion will not be reviewed. Motley v. Motley, 93 Mo. App. 473.

BROWN, C.—The petition was filed March 8, 1908. It prays for a divorce from defendant, for the custody of their minor child aged seven and one half years, and for alimony. The grounds stated are desertion, cruel treatment, indignities and adultery, all of which were set forth in numerous specifications. It also states that the child, who was a boy and named after the defendant, had always been in the care of the plaintiff; that the defendant is a man of great wealth, owning property which plaintiff believes to be worth one and a half million dollars; that she has no money or property except a few articles of small value, and concludes with a prayer for divorce, for the custody of the child, for alimony in gross, for alimony pending the suit, and for suit money. The defendant filed an answer admitting that he was married to plaintiff on the 24th day of October, 1889; that he left her on the 13th day of October, 1906, and had not lived with her since that time; that he had stated that he would not live with her again; that it was in fact his purpose not to live with her longer, and the birth of their son as charged. He denied all other allegations of the petition. The answer then set out, by way of cross-petition, that the plaintiff had repeatedly and continuously, since about June, 1903, up to the time of

the separation, offered defendant such indignities as, rendered his condition intolerable; specifying neglect of her household duties; that she frequently stayed out late at night without explanation upon her return as to where or with whom she had been; that when he suggested that her conduct exposed her to public criticism she became enraged and said "to hell with the public," that she would do as she pleased; that in January, 1905, he found a letter written by her and intended for a man unknown to him, in which she expressed great affection for the unknown man and great antipathy to the defendant, because of which he employed a detective to observe her during a visit which she made to Florida soon afterwards and in January, 1905; that before the marriage plaintiff had made a written agreement whereby she agreed that any children which might be born of such marriage should be brought up and educated in accordance with the wishes of the defendant, and that he should have the absolute control of their moral, religious and collegiate training; notwithstanding which she caused the child, soon after its birth, to be baptized in the Catholic faith without his knowledge and consent, and concealed the fact for three years; that her mode of dressing was so conspicuous as to excite comment and ridicule; that she insisted on bringing her sister to the house, notwithstanding the fact that the sister had shown great discourtesies to defendant and ignored his presence and had ceased to speak to him; that plaintiff while in Florida had sent this sister to their home to give instructions to a servant; that upon his writing to plaintiff's father requesting him to keep the sister away, the latter wrote a letter saying she would not repeat her visits in the absence of plaintiff, but after the return of plaintiff from Florida the sister continued to present herself at the home notwithstanding her presence was so distasteful to defendant that he would not eat at the same table; that plaintiff neglected her du-

ties in the household to such extent that for long periods of time she would remain away from the house a greater part of the day and often late into the night with only the laundress in attendance, and would not attempt to engage other servants, and when he remonstrated would say that she was tired of the trouble and bother of the house and would suggest that if defendant was not satisfied he could engage servants himself or leave the house; that while plaintiff was absent in Florida, and again for a period for six weeks in 1906, at different summer resorts, she had but one servant in their home, and made no effort to secure others to look after his comfort in her absence; that her disposition was so quarrelsome and her temper so violent that she was unable to keep servants; that during February, March and April, 1906, his mother, who lived across the street, was seriously ill, and often requested him to send his little son to her for a few minutes of the day, but that she refused to permit the child to go, and compelled defendant himself to take him; that during the month of September, 1906, by continuous ill temper, she made it impossible for them to converse and live together; that she made it a point to come late to breakfast in order to prevent him from breakfasting with his son, and always insisted that the child should breakfast with her. The prayer was that he be divorced from plaintiff and granted the custody of the child and that the petition be dismissed.

The plaintiff replied with the general denial, and an attempt to explain the letter to the "man unknown" mentioned in the answer.

The cause was tried at the February term, 1909, and on the 18th of that month, during the same term, the following judgment was entered, except that the words italicized were not included but were inserted as hereinafter stated.

"Now at this day, the court being fully advised of and concerning the cause heretofore submitted to the

court upon the pleadings and proof, and the court having heard the evidence herein, doth find that plaintiff is entitled to the relief prayed for in her petition, to be divorced from the bonds of matrimony contracted with the defendant, for the cause stated in said petition, to-wit, that said defendant has absented himself without a reasonable cause for the space of one year. And the court doth further find and adjudge that plaintiff is not entitled to a decree of divorce on any other ground stated in plaintiff's petition, and doth find the issues on said grounds in favor of said defendant.

"And the court doth further find against defendant on defendant's cross-bill, and doth order, adjudge and decree that the said cross-bill be and the same is hereby dismissed. And the court doth, therefore, order, adjudge and decree that plaintiff be absolutely and forever divorced from the bonds of matrimony existing between herself and said defendant, and that she be restored to all the rights and privileges of a single and unmarried person.

"And the court doth further find that plaintiff is a suitable person to have the care, custody, control and education of Wm. J. Lemp, age eight years, the only child of plaintiff and defendant herein.

"The court doth therefore order, adjudge and decree that plaintiff herein have the care, custody, control and education of said child, Wm. J. Lemp, until further order of this court. And the court doth make the above order on condition that during the period of time the said plaintiff has the care and custody of said child he shall reside and attend an established public or private school in the city of St. Louis, until the further order of this court, and that defendant shall have the custody and companionship of said child from Saturday morning at nine o'clock until Sunday evening at eight o'clock of each and every fortnight, commencing on the 20th day of February, 1909, and continuing until the further order of this court, upon notice by the de-

fendant to the plaintiff of his wish to exercise his right of such custody and companionship.

"The court doth further order, adjudge and decree that during the periods of summer vacation the said plaintiff may take said child to any usual and accustomed resort for time not exceeding three months during any summer, provided, however, that the defendant shall have the right to the custody and companionship of said child for a continuous period of two weeks during each summer vacation, the time of such custody and companionship to be determined by defendant and notice of such time to be given' by him to the plaintiff two weeks in advance.

"And the court doth further order, adjudge and decree that plaintiff recover of defendant, as alimony for the support and maintenance of plaintiff and for the support, maintenance and education of said child, Wm. J. Lemp, the sum of six thousand dollars ($6000) per annum, payable in equal quarterly installments of fifteen hundred dollars ($1500) each, the first payment thereof to be made on the first day of March, 1909, and thereafter on the first day of each and every June, September, December and March, until the further order of this court, *and that said payments of alimony to continue during lifetime of plaintiff or until she remarries, and in the event of the prior death of the defendant the said payments of alimony to be and constitute a charge and lien upon his the said defendant's estate.* And the court doth further order that said defendant execute a bond in the sum of thirty thousand dollars ($30,000), with surety to be approved by the court, conditioned for the payment of said alimony in accordance with the decree and order of the court. And the court doth reserve the right to make such other and different orders in respect to the custody, education and maintenance of said child and the alimony herein granted as may hereafter appear proper.

"And the court doth further order, adjudge and

decree that plaintiff recover the costs of court in this proceeding and have execution therefor.''

On February 19, during the same term, the plaintiff filed a motion for a new trial in which the grounds now relied on were stated in sufficient detail, and may be summarized as follows: (1) That the court erred in its judgment that the plaintiff was entitled to a divorce on no other ground than that defendant had absented himself without a reasonable cause for the space of one year. (2) That the court erred in each of those provisions in the decree limiting the plaintiff's custody of the child and giving such custody temporarily to defendant. (3) That it erred in refusing to adjudge alimony in gross and also in limiting the alimony decreed from year to year to the sum of $6000 per year as well as in allowing yearly alimony instead of alimony in gross as prayed in the petition. (4) The usual complaint for error in excluding competent and admitting incompetent evidence. (5) In refusing, on plaintiff's petition, duly verified, to issue a subpoena *duces tecum* for the production of certain books of the Wm. J. Lemp Brewing Company, showing the assets and earnings of that corporation.

On March 8 and during the same term the plaintiff filed her motion for alimony pending an appeal from the decree, which was allowed in the sum of $500 per month, and also for suit money, including attorney's fees, in connection with such appeal, which, after the introduction of evidence, in which there was no conflict, that $5000 would be a reasonable amount for attorney's fees on such appeal, was overruled. During the same term and on March 11, 1909, the court overruled the motion for a new trial and on the same day entered the following order:

''Now at this day the court of its own motion, for sufficient cause appearing, doth order that the decree heretofore, on Thursday, February 18, 1909, entered in this cause, be modified in respect to the judgment

for alimony therein contained, and that said decree as amended be now entered which is accordingly done in words and figures as follows, to-wit:''

Then follows an entry of the entire judgment including the portion in italics as already copied.

Exceptions were duly saved by plaintiff to the adverse rulings.

The evidence will be noticed as necessary in the opinion.

I. It is insisted by respondent that because the judgment was modified after the filing of the motion for a new trial and no such motion was filed thereafter, there is no matter of exception presented to this court for review.

As has been often stated by this court, an office of the motion for a new trial in our practice is to present again to the trial court such questions as have been decided by it during the trial, so that it may have an opportunity to correct errors made, perhaps, without the opportunity for consideration required by the difficulty of the questions involved. It "is generally not necessary to secure a review of decisions on motions rendered before or after the trial, but is required where the ruling is made during the trial. The error of the law must be one pertaining to the trial of an issue of fact." Shohoney v. Railroad, 223 Mo. 649, 660, and cases cited.] That it may or may not be included in the entry of the final judgment does not change its nature. [Blanchard v. Dorman, 236 Mo. 416, 445.] The modifying order here was one which might have been made at any time after final judgment, and was made long after the expiration of the time allowed by law for the filing of the motion for a new trial, which had, in fact, been filed, and was ready for determination; and it was the duty of the court, by its formal order, to grant or withhold the relief it

asked. It recognized that it was not then *functus of-ficio* by overruling it. In doing so it passed upon and decided, adversely to the appellant, each question presented as ground for a new trial, applicable to the judgment as it then stood. If it had been afterwards modified, so as to correct and obviate the same errors, that fact would appear in the record here, and affect the disposition of this appeal accordingly. No attempt has been made, however, to correct any of the errors so assigned, so the judgment, with respect to them, stands and has continuously stood, unaffected by the modification, so that it was unnecessary to again raise the same questions, by another motion for a new trial. There is nothing in Critchfield v. Linville, 140 Mo. 191, inconsistent with this conclusion. In that case there was but one judgment in the record before the court.

II. The important questions in this case arise from the contention of the plaintiff that the refusal of the court to allow her alimony in gross instead of from year to year constitutes reversible error. Incidentally she contends also that, even upon the theory that under the circumstances it was within the discretion of the court to fix yearly alimony in lieu of all other provision for her, the amount so allowed is too small, and that error was committed by the trial court in the restrictions imposed by the decree upon her custody of the child.

This court has lately said (Viertel v. Viertel, 212 Mo. 562, 575) that the general rule is that "the allowance of permanent alimony is a matter of sound judicial discretion, to be exercised with reference to established principles and upon a view of all the circumstances of each particular case, such as the estate and ability of the husband, the condition and means of the wife, and the conduct of the parties." This leaves us still to deal with the "established principles," with

reference to which this discretion must be exercised. In considering the subject of divorce from the bond of matrimony, we cannot go to that prolific source from which so much of our jurisprudence has grown—the common law of England—for the reason that, until the statute of 20 and 21 Victoria, c. 85, went into operation in 1858, no English court had jurisdiction to dissolve a marriage for any post-nuptial cause. Up to that time the ecclesiastical courts established by the Conqueror exercised jurisdiction in all matrimonial matters according to the canon and episcopal laws. These courts, while they had jurisdiction to declare a marriage void *ab initio* on ecclesiastical grounds, or, as it was sometimes expressed, because it was forbidden by God's law, had no jurisdiction to dissolve it; so that the question of the allowance of alimony upon the dissolution of a valid marriage was not, and could not become, a part of the common law brought to this country by the English people, and adopted in this jurisdiction before Missouri became a State. "Marriage and alimony are, under the unwritten law, inseparable." [2 Bishop on Marriage, Divorce and Separation, sec. 854.]

The jurisdiction of the ecclesiastical courts seems to have been founded in the theory that marriage was a religious sacrament, and whatever of a contractual nature may have been operative in its origin, was merged in the religious status which it created, and which could not be destroyed without violating the Divine Law. The civil status found no recognition in these courts, and could only be dissolved, for causes originating during its existence, by act of parliament. The separation which the ecclesiastical courts had jurisdiction to decree was considered an evil at the best, excused only by considerations of humanity and decency, and mitigated by the hope of ultimate reconciliation. Under such a theory and such conditions alimony originated. As the name implies it was simply

intended as sustenance for a woman made destitute and helpless by the misconduct of a husband unmindful of his duties, until such time as he might be brought to a realization of his wrong and the resumption of his marital obligations. A bare support of the character to which her husband's position entitled her was the measure of her right.

These theories found little favor in governments which held civil and religious liberty to be the normal condition of a people, and of which the separation of church and State was a fundamental principle. In Missouri, as far back as 1835, it was held by this court in State to use v. Fry, 4 Mo. 120, that marriage was within the provisions of the State and Federal constitutions protecting the obligation of contracts. Judge McGirk, for the court, said (p. 184): "Again, let us look at the case of the wife—she contracts for a protection—for a maintenance suitable to her degree and to his fortune—for the third part, or the half of his personal estate, in case of issue or not—for maintenance and education of her children—for the third part of his real estate, for her life, in case she survives him—and above all, for a faithful friend and companion and adviser through life. Yet it is argued that these benefits contracted for, and arising out of the contract of marriage on both sides, are not within the restriction that the obligation of contracts shall not be impaired. That they were not thought of by the convention—but if they were thought of they were deemed inferior to the benefits arising out of a contract to dig a ditch or a well. I cannot believe it—I think this contract, together with all its advantages, was intended to be, and in reality is, protected by the prohibition."

In 1835, and while the Fry case was still pending here, the Legislature enacted a law which is now section 8279 of the Revised Statutes of 1909, providing that marriage " is considered in law as a civil con-

tract.'' In 1848, the question was again here in Bryson v. Campbell, 12 Mo. 498. The court, referring to the authority of the Legislature in such cases, said: ''The authority to do so was disaffirmed by a former bench of this court, in a case (Gentry's Case, 4 Mo. 120) originating before the legislative enactment of 1835, which has remained in force ever since, and which declares in concurrence with the judicial opinion alluded to, that marriage is 'a civil contract.' The marriage in question having taken place subsequent to the act aforesaid, and under what we consider its express guaranties, to sanction the legislative competency to interfere with such a 'contract,' would be scarcely less objectionable upon the score of public justice, than it has heretofore been deemed to be incompatible with public policy and the constitutional distinction of the powers of government.'' The same doctrine has since been approved and affirmed in Bryson v. Bryson, 17 Mo. 590; Bryson v. Bryson, 44 Mo. 232, and in Dorrance v. Dorrance, 143 S. W. 94.

Some learned jurists and authors have found difficulty in the classification of marriage as a civil contract, because the status created by it is necessarily, in many respects, under the control of the State in the exercise of its police power in the interest of the general welfare. Some of them have said, in effect, that this relation is *sui generis* in its contractual features, because the State may, through its legislature, change the duties and obligations of the parties, and provide new violations for which it may be dissolved, and that, as the parties move from jurisdiction to jurisdiction their duties, growing out of the relation, are prescribed and governed by the law of the place in which they may be. All these features, however, find their counterpart in purely contractual conditions. The domestic relations are of peculiar concern to the state, and they are subject to control for the general welfare like the callings which involve the exercise of public franchises

and the performance of quasi public functions and duties. Persons who associate themselves together as common carriers subject themselves to such control as may be imposed by law from time to time for the public good; and whenever they cross the line that marks the jurisdiction of another State or government, the laws of that jurisdiction become imposed upon all their contractual relations. Judge McKirk, in the opinion from which we have already quoted, referring to the lawful exercise of the police power, said: "Must not the law of the land declare who may make a contract to dig a well, and what rights the parties shall respectively have, in case this contract is either fulfilled or broken? In the one case the operator has a right, when he complies with his agreement, to have a compensation. In the other, the owner has a right to the use of the well, and in case of a failure by either, the other has a right to insist on a compensation for the failure."

It seems, therefore, to be settled in this State, not only that we must consider marriage as a civil contract, which is only a plain statutory mandate which we are not permitted to gainsay, but those words have no occult meaning in their application to the marriage relation, and afford a valuable guide in the assessment of the compensation which the statute provides for the innocent and injured wife upon the dissolution of that relation. It has always been recognized that marriage is not only a valuable consideration but a highly meritorious one, and constitutes an ample foundation for all those rights and interests which are, from time to time, in the development of our social system, secured by law to the faithful wife in the property of her husband, as well as for the protection of herself and the children of the marriage. It is logical and right that, for a total breach of this contract, she should be as favorably considered as he who makes a horse trade, or buys or sells a mine. The position

she would occupy, were the contract faithfully performed to the end, should have something to do with the compensation for its breach. Mr. Nelson, in his treatise on Divorce and Separation (Vol. 2, sec. 910), says: "It would be better to consider the permanent alimony as damages for the breach of the marriage contract;" and this idea has become a dominant one in our modern jurisprudence.

From this standpoint there are two elements which must be separately considered to insure complete justice. The obligation to support, maintain and protect the wife often exists where no property interest is involved. By the marriage contract the husband pledges himself to do this, and, if he has no property, his future earning capacity must be utilized for that purpose. In such cases a judgment in gross might defeat the very object to be attained. For this reason it is often necessary that alimony should be paid from time to time to conserve the ability of the husband to meet the obligation. This, however, is a makeshift at the best, and does not result in the complete and immediate compensation to which one is entitled as damages for a broken obligation. It is just and humane, and lies at the very foundation of the policy of absolute divorce, that the innocent and injured woman be delivered from the body of her dead injury, and not be required for life to live in its atmosphere and taste its flavor with her daily bread. It has accordingly already become the habit of the courts in most of our English speaking jurisdictions to decree alimony in gross when there is property to respond; and this policy is, we think, not only authorized, but imposed by statute on the courts of our own State in all proper cases. [Laws 1868, p. 47; R. S. 1909, sec. 2373.] Although it is made discretionary, this discretion must, in accordance with the rule of the common law, be a sound one, exercised in accordance with those principles in which the statute that created it has its founda-

tion.   There can be no doubt that the Legislature was
actuated by the sound policy against which there can
be no argument, of doing complete justice in cases
where, as in this one, existing property is the only ele-
ment out of which it may proceed.   That this principle
has been adopted and acted upon by this court is made
plain by its judgments in Golding v. Golding, 74 Mo.
124; Gercke v. Gercke, 100 Mo. 237; Viertel v. Viertel,
212 Mo. 562.

In this connection it is instructive to note the
growth of this idea in the mind of one of the greatest
of our legal authors, whose grasp of legal reasoning
and perspicuous statement has lightened the labors
of many of us in our feeble attempts at the practice
of American law.   Mr. Bishop wrote his treatise on
Marriage and Divorce at about the time of the enact-
ment of the English statute of 20 & 21 Vict., c. 85.   Up
to that time there had been no law in England relating
to alimony independent of the continued existence of
the marriage relation, while in this country the subject
was still in its infancy, and the ingenuity and learn-
ing of the distinguished authors were taxed in the ap-
plication of the principles of the unwritten ecclesias-
tical law to the conditions created by the dissolution
of that relation.   It is unnecessary to express our
hearty commendation of his wonderful success in that
respect, for, nearly forty years afterwards, in the
light of a riper experience, he wrote a new book—
Marriage, Divorce and Separation—in the preface of
which he said: "It arranges all in an improved order;
and it treats all from the standpoint of today, as
though the author had never before written on the
subject.   .   .   .   For it recognizes the fact that while
the past lives in its translated wisdom and reason, its
inert, dead forms are buried, and the dealings of prac-
titioners and judges are exclusively with the future."

It appeared to this learned commentator incon-
gruous that a husband, by a wilful breach of the mar-

riage contract resulting in a dissolution of the relation, could deprive his wife of the same participation in his property secured to her beyond his power to defeat or modify, by the legislative policy "of today," where the relation is dissolved by his respectable decease, in the full discharge of his marital obligations. He concludes (2 Bishop on Marriage, Divorce and Separation, sec. 1029.) that "the dissolution of a marriage by divorce is analogous to its dissolution by death," while a judicial separation is only partly so, and in section 1064 of the same volume, crystallizes his conclusions as to a disposition in the following propositions: "(1) The innocent party should not be left to suffer pecuniarily for having been compelled, by the ill conduct of the other, to seek the divorce; (2) The wife, made thus in effect a widow, should not ordinarily be set back simply where she stood in property when she entered the marriage; she has given her time, her virginity, her earlier bloom, where she has been rewarded with ill faith in return for her faith; (3) She should not stand worse than if death, instead of divorce, had dissolved the connection."

This application of the unwritten law of alimony to modern conditions arising from the dissolution of the marriage was perfect in its logic. By the unwritten law it was designed that the wife should lose nothing by the separation that had been forced upon her, but should, during the joint lives of herself and husband, be supported in the style to which the marriage entitled her, and at his death fare the same with respect to her dower and other allowances as if no separation had intervened. From the reasonable theory adopted by Mr. Bishop, flows the same result, except that the marriage relation is terminated by the divorce intead of by the death of the husband, and from that time forth her participation in all his faculties, whether of income or estate, are to be included in alimony. The wife is exactly compensated for her

marriage rights, while the husband receives no premium or other reward at the hands of the law for the violation of his marriage obligations. The amount of the alimony necessarily depends, so far as it relates to the deprivation of property rights, upon the statutes of the several States in which the marriages exist and are dissolved. Such statutes are quite liberal to the wife in this State, giving her, in addition to her dower in his real estate, the title absolutely to a share in the personal estate belonging to the husband at the time of his death equal to the share of a child. [R. S. 1909, sec. 349.] Our statutes also provide (Id., sec. 358) as follows: "No act, deed or conveyance, executed or performed by the husband without the assent of the wife, evidenced by her acknowledgment thereof, in the manner required by law to pass the estate of married women, and no judgment or decree confessed by or recovered against him, and no laches, default, covin or crime of the husband, shall prejudice the right and interest of the wife provided in the foregoing sections of this article."

In both the Gercke and Viertel cases already cited, this court seems to have proceeded along the same lines we have indicated. In the Viertel case there were two children, and the court allowed the wife as alimony eleven thousand dollars out of a real and personal estate "between $30,000 and $35,000 in value." This was one third of the estate, and in that case, a child's share. In the Gercke case six thousand dollars was allowed out of "an estate estimated to be worth from ten to fifteen thousand dollars." This was evidently intended, so far as proportion was in the mind of the court, to be one-half the husband's estate. In the Viertel case the court, referring to the amount of alimony allowed, said: "It was well within the boundaries of approved cases;" citing Hamilton v. Hamilton, 37 Mich. 603, and Metzler v. Metzler, 99 Ind. 384, in both of which the allowance amounted to

one third of the husband's estate.  The following are
a few cases from other jurisdictions that seem to pro-
ceed along the same lines.  [Horning v. Horning, 107
Mich. 587; Tuttle v. Tuttle, 26 S. D. 545; Griffin v. Grif-
fin, 18 Utah, 98; McChesney v. McChesney, 91 Wis.
268; Drake v. Drake, 21 S. D. 182; Segelbaum v. Segel-
baum, 39 Minn. 258; Stillman v. Stillman, 66 Tenn. (7
Baxt.) 169; Jeter v. Jeter, 36 Ala. 391.]    In Bialy v.
Bialy, 133 N. W. (Mich.) 496, where the husband's es-
tate amounted to $350,000 and the wife had $3800, she
was granted $100,000 permanent alimony.  The court
in that case proceeded upon the old ecclesiastical doc-
trine of alimentation.  In Muir v. Muir, 133 Ky. 125,
the court said: "Alimony given upon a decree of di-
vorce becomes the wife's portion in lieu of dower. . .
Where she is entitled to alimony it would seem to be
improper to give her less, in any event, than what her
dower in her husband's estate would be."    Arkansas
has endeavored to crystallize the same idea into a
statute giving to the wife who obtains a divorce one-
third of the husband's personalty absolutely, and one-
third of the lands for life.

We think it may be truthfully said that this just
and logical doctrine of compensation pervades the re-
cent adjudications upon this interesting subject.  But
the almost endless variety of the conditions and con-
siderations encountered, out of which must be devel-
oped the means of doing justice to the parties, calls for
a sound judicial discretion to be exercised with refer-
ence to the established principles upon which the juris-
diction is founded.  The judges do not stand *in loco
parentis* to these litigants, with power to give and take
away as they may be moved by personal feeling or
caprice.  They are the guardians of their legal rights,
with power to exercise their discretion to secure and
protect them, but no discretion to violate them.  As we
have already seen, the condition of the parties may
constitute an element calling for the exercise of dis-

cretion in consideration of the ability of the guilty husband to pay and of the innocent wife to collect a judicial award of this character, but in this case that element is practically eliminated by the fact that the defendant is in good financial circumstances and amply able to respond to a judgment involving a just and reasonable proportion of the faculties which the law takes into consideration in such a computation. His estate consists almost entirely of personal property. A careful computation of the items detailed in his own testimony, leads irresistibly to the conclusion that its value is more than twelve hundred thousand dollars and we do not understand that this is questioned in the case. This naturally suggests the inquiry as to whether this value constitutes any reason for the amelioration in his favor of the rule applicable to persons with lesser estates. The books are not silent on this question. Mr. Bishop (2 Marriage, Divorce and Separation, sec. 1035) says: "Neither in reason nor in judicial practice is the rule, sometimes governing temporary alimony, that a less proportion will be given out of a large income than a small, applicable in permanent. Sir John Nicholl even suggested, while yet not deeming himself authorized to carry the suggestion practically to its full length, that when the property is large the considerations are reversed, and the proportion should be greater. 'It is the delinquent then who should have the mere subsistence, and who ought to live in retirement.' " In a note to the same section the author says: "And when the husband dies, the wife's proportion is the same. It will not do to say that a certain sum is as much as a woman can reasonably spend; there is no limit even to reasonable expenditures; especially there is no judicial yardstick by which expenditures can be measured off." There is also in the suggestion that the rule, while proper to enforce against the poor, should be modified in favor of the rich, something which revolts the clean moral

sense in which the law finds its excuse for existing. From this standpoint the judgment of the court assumes the character of a luxury which only the opulent can afford. The thought naturally turns our mind away from all modern authorities to the case of the widow, who of her want cast into the treasury two mites, which was more than all who gave from their abundance had cast in.

The judgment is an adjudication that the plaintiff was the innocent and injured party and that defendant was the guilty party who, by his conduct, had forfeited all rights and claims under and by virtue of the marriage. To this adjudication the State, representing the social interests of its people, was also a party and equally bound by the result. This adjudication not being questioned here we·must assume for all the purposes of this appeal that the plaintiff is innocent and that the defendant is guilty of having so injured her in the violation of his marital obligation as to justify its dissolution not only with the consent but by the act of the State. It is suggested, however, that their conduct, in some respects not made entirely clear, is open to investigation by the court for the purpose of aiding it in determining the amount of alimony to be awarded. The defendant in his brief quoted with every evidence of approval from one of the numerous opinions in the famous Burr case (7 Hill, 207) as follows: "In fixing the amount of alimony, reference ought first to be had to the ability of the husband, which in this case is ample. There·is no reason for reducing the allowance on account of the limited means of the husband; neither is there any reason for increasing it beyond those limits which·a fair construction of the statute would prescribe, because his conduct has been mean and disgraceful. He is a rich, miserable old man; yet he is as much entitled to have his cause decided by the fixed, known laws of the country, as if his morals were without a stain and

his reputation fair as that of the most virtuous and eminent in society.'' But as cases may arise in which the conduct of the parties as well as the more material consideration of estate may become an element, and as the parties have chosen in their respective arguments to treat the subject to some extent from that standpoint, we have carefully read the evidence so as to be able to follow them intelligently into that field. In so doing we have taken into consideration chiefly the testimony of the defendant, considering all other evidence for the purpose only of aiding in the explanation of those things which he left unexplained. We do not think that he will disagree with us in the conclusion forced upon us by his story, that for a long time before the bringing of this suit he attempted by his conduct to bring such pressure to bear upon his wife as would induce her, notwithstanding objections interposed by her religious training, to take such a course. In this respect he is not entitled to invoke the sympathy and aid of this court to make the consummation of his plan easier or cheaper than a strict compliance with the law requires. His marriage was ushered in by an act on his part such as brings little credit to a man of mature years about to assume those moral responsibilities which result from the relation of husband to a young woman who trusts him. In accordance with some rule of her church he went before its bishop and signed an agreement relating to the religious training of such children as might be the result of the marriage. He relates, apparently without embarrassment, that he had no intention to keep the promise it contained, and required his wife, on the same day, in the presence of members of his family, to sign another paper prepared by some one at his direction, promising that the baptism and moral and religious teaching of such children should be left absolutely and entirely to his dictation and control, and that she would do everything in her power to faith-

fully carry out his desires and requests in the matter and closing with the following paragraph: "I further declare that this promise is to supersede any and all agreements and promises that have been given by the said Wm. J. Lemp, Jr., or by me relative to the religious and other training and bringing up of our children.

"Given voluntarily, at my suggestion, this twenty-first day of October, 1899."

While Mr. Lemp was at perfect liberty to refuse to sign and deliver to the Bishop the promise mentioned, his frank admission that it was done in bad faith and for the purpose of deception, augured badly for the moral success of the contemplated union. The last clause of the agreement which Mrs. Lemp signed is of the same character as the one commented upon by this court in Mowry v. Norman, 204 Mo. 173, 192. In the language of the court in that case, such expressions "point to a master mind." They are not the language of young girls just going to their marriage.

The rule of Mr. Lemp, as a husband, hardly comes up to the standard of "tact, chivalry, justice and sweetness" indicated in the opinion of Judge LAMM for this court in the Viertel case. To use his own language he spoke with firmness. Sometimes he came and went for periods of a month or more without addressing his wife. He says there were possibly three months, a month at the time, in 1904 of such reticence. His attitude toward her parents and other members of her family was such that but one of them, a sister, visited her. He says he has left the house possibly fifty times on account of her presence in it. He habitually carried a revolver in his pocket and when irritated made demonstrations with it, taking it from his pocket and laying it on the seat of the carriage, putting his hand to its resting place in his hip pocket, and on one occasion "covering" the butler with it during a quarrel in the presence of his family in his dining room and

kitchen. After an altercation in their home, in which she testifies that her face was disfigured so that it was necessary to conceal it from the family and friends beneath a veil until it recovered its normal appearance, he says that she locked herself in her room while he went to the brewery and obtained a watchman who returned with him and under his direction attempted to open her bedroom door. All these things are related by Mr. Lemp as if they were the natural amenities of married life. Mrs. Lemp related in her testimony an occurrence in their dressing room that will bear repeating for the light that it gives us upon the relative reliability of herself and husband. She says: "He was sitting there toying with the revolver; was fooling with it and mumbling to himself, and the revolver was always pointed at me. And I went over and talked pleadingly to him, sort of coaxing. I got the revolver away and put it on the table." This made her so nervous that she left the room, when the revolver was discharged. She was frightened and went back and found Mr. Lemp sitting laughing with the revolver in his hand. Mr. Lemp states in his testimony that upon this incident being called to his attention in the petition, he directed an architect to examine the room, and the bullet hole was found in the panel under one of the windows. He says he may have made it and refuses to state that he did not, although he has no recollection of the circumstance. When asked by his attorney if he did it consciously or intentionally the word consciously was withdrawn and he said he did not do it intentionally. He slept with this revolver under his head. To a person who has kept track of the criminal history of the country, the inquiry may naturally occur whether or not it is negligence in a wife to live with a husband of such proclivities. He also relates in his testimony that he paid during his marriage the funeral expenses of Miss Lulu Morrison, the keeper of a house of prostitution in St. Louis. Many

estimable and deserving women had died in St. Louis in those years and that such interest should be shown in such a one might naturally interest a wife.

While the defendant's answer contained many insinuations against the plaintiff there was no question raised in the testimony as to her faithfulness and good conduct as a wife and mother except the circumstance that the defendant found, as he says, in the drawer of the library table where the family stationery was kept, two pieces of paper, upon one of which was written the following:

"My Dear Little Pal:—I wish you could see what I am going through to make 'him' take me to the show tonight, of course the day is not over, and I may still succeed, if I fail I shall go anyway with Ham and Ella, however, 'he' does not know that. Tomorrow I will again take Vella to the matinee. Although I cannot be with you to watch you at a distance or to feel your presence is my only happiness and greatest recreation. Do telephone me 'when' you can, as I usually answer the phone 'now.' In case I cannot, you can always put up the phone again, or else say my 'Brother' wishes to speak to me. He is going hunting next week and I wish to heaven he would never return, I am completely worn out and God alone knows how much longer I can stand this loathsome bondage."

On the other, was a poor, halting, pathetic paraphrase of the three first stanzas of Henley's "Out of the Night that Covers Me." It is pitiful in its crudity, and the writer seems unable to take heart to raise herself to the jubilant climax of the little poem—"I am the captain of my soul."

This was found by Mr. Lemp soon after the episode of the watchman to which we have referred. He testified that he does not know whether the "Little Pal" refers to a man or woman, and compliments his wife by saying that he had never seen anything in her

249 Mo.—21

conduct to give him ground for an opinion as to the identity expressed by the words. Mrs. Lemp explains it by saying that she wrote and placed these composi- tions where she knew he would find them, and expected he would come to her for an explanation and thus pre- pare the way for a reconciliation. The writer believes this, for there was, according to his story, no attempt at concealment, and the attempts of women to revive the affection of husbands and lovers by exciting their jealousy have been celebrated in song and story ever since the world of literature began. She had the right to expect he would come to her, for what man would not reach out to help his friend whom he believed stood in danger of making a fatal mistake? And how much heavier does such a duty rest upon one in case of his wife, whom he is bound by the laws of nature as well as of society to protect. All this did not occur to Mr. Lemp. He simply sought a lawyer, and put a de- tective on her track to secure material to enforce his freedom from the marital obligations which chafed him.

Hardly an episode in human life can be suggested which does not find a precedent in judicial experience. The plaintiff's theory with respect to these letters is no exception to that rule. In Jeter v. Jeter, supra, the plaintiff had actually written and transmitted two letters to gentlemen about her husband and her mar- riage, of which the court says: "While these acts cannot be passed by without condemnation and cen- sure, as inconsistent with the conduct of a prudent spouse; yet we have no evidence of the occurrence of such conduct on other occasions, and those acts seem to stand as blots upon a history otherwise blameless. Besides, it is some palliation of her improper conduct in those particulars, that it did not occur until her hus- band had withdrawn every manifestation of affection, and deprived her of his counsel. For such misconduct, perpetrated under such circumstances, justice does not

demand the denial of a liberal allowance to her. The defendant imputes a criminality to his wife which would justify his deportment to her, and deprive her of all claim to his liberality, or to the liberality of the court; but, if such criminality existed, it is his misfortune that he has not been able to prove it, and the court must act upon the case as made by the testimony.''

Under the circumstances we do not think that there is anything in the conduct of the plaintiff to justify us in depriving her of such provision as she would be entitled to by the application of the general principles we have stated. In this case, however, the solution is not to be found in a mere division of property which consists principally of shares of the capital stock of close corporations, controlled by those who, the plaintiff seems to have some reason to apprehend, may become inimical to her interest. The evidence in this case with reference to the application of the net profits arising out of the principal item of this stock, strongly suggests that it will be to her interest that her allowance should consist in a gross sum of money that may be controlled and invested as her own interests may indicate, and as she shall be advised, even at the expense of such modification in the nominal amount of the judgment, as shall be fair and just to enable the defendant to meet such condition.

III.   The respondent in his printed argument says: "It is argued that the lower court erred in refusing to award appellant suit money for this appeal. We have already shown that no motion for rehearing of the order denying appellant's motion was filed, and that, therefore, there is nothing here for review. If there were, however, we would say that the granting of suit money to the wife, to enable her to prosecute an appeal from a decree in her favor, on the ground that the permanent alimony awarded is insufficient, is entirely within the discretion of the trial court, and

that no allowance need be made if the appeal appears to be without merit.''

The first contention is sufficiently considered and disposed of in the first paragraph of this opinion. As to whether the appeal is without merit depends somewhat, in its legal aspect, upon the judgment of this court, which has the unquestioned right to give such judgment as in its opinion should have been given by the circuit court, or to reverse the judgment of the circuit court and remand the cause with directions covering its final disposition.

For the reasons stated in this opinion, the judgment of the circuit court of St. Louis is reversed in so far as it relates to the allowance of permanent alimony, and the order of the court overruling plaintiff's motion for the allowance of suit money with which to pay the expense of this appeal is also reversed, and the cause remanded, with directions to said court to so modify its final judgment and decree that the plaintiff have and recover from defendant, as permanent alimony in gross, the sum of two hundred and fifty thousand dollars ($250,000); provided, that if he so elect, he may pay of said amount the sum of $50,000 in cash upon the entry of the decree, and also, at the same time, give bond, in form and with sureties satisfactory to and approved by the court, to pay the remaining $200,000 as follows: $100,000 in six months, and $100,-000 in one year from the date of such judgment and decree, the deferred payments to bear interest at the rate of five per cent per annum, payable semi-annually, and that the plaintiff have execution for the amount of alimony so awarded or any part thereof remaining due and unpaid; and that the cost of the care, maintenance and education of the infant child be borne by plaintiff so long as she shall have and be entitled to the custody by order of the court. Also that the plaintiff have and recover of and from the defendant the sum of five thousand dollars ($5000) as suit money to enable her to pay

the expenses of this appeal except taxable costs, and that she recover her costs, and have execution.

This cause coming into Banc and being reheard there the opinion of BROWN, C., is modified so as to conform to the original suggestion of WALKER, J., fixing the amount of the alimony in gross at the sum of one hundred thousand dollars and as set forth in his opinion, which said opinion of BROWN, C., as so modified is refiled as expressing the views of *Lamm, C. J., Woodson* and *Brown, JJ.*, suit money to be paid as directed in the *per curiam*.

## PER CURIAM OPINION.

PER CURIAM.—The majority of the court agreeing on a judgment, but not being in accord on the reasons and grounds leading up to it (as seen by opinions filed), it is ordered that the judgment of the circuit court be reversed and the cause be remanded with directions to enter a judgment granting plaintiff a divorce with alimony in gross in the sum of one hundred thousand dollars payable one-half in thirty and one-half in sixty days.

Suit money in circuit court to be paid as directed by the original judgment of the circuit court. The custody of the child to remain as directed in the original judgment subject to the future orders of that court on cause shown.

*Bond, J.*, expresses his views in a separate opinion.

## SEPARATE OPINION BY BOND, J.

### STATEMENT BY THE COURT.

Plaintiff secured a divorce from her husband on the sole ground that he had absented himself for the space of one year without reasonable cause. In its

decree the court awarded the custody and education
of the child of the parties to the mother until further
order of that court, with a proviso that the father
should have the custody and companionship of the
child Saturday and Sunday of each fortnight, and also
for a continuous period of two weeks during each sum-
mer vacation; and directed that the child should at-
tend an established public or private school in the city
of St. Louis; and reserved the right of future dispo-
sition. It awarded the plaintiff temporary alimony,
payable in quarterly installments at the rate of $6000
per year during her lifetime or until she remarried.
From this decree, and from an order of the court over-
ruling her motion for $5000 as a reasonable allowance
for suit money, plaintiff appealed. Alimony was also
awarded at the rate of $500 per month during the pros-
ecution of the appeal.

## OPINION.

BOND, J. (after stating the facts as above).—I.
The record in this case convinces me that the two par-
ties were unfitted to bear towards each other the rela-
tion of husband and wife, and that their marriage,
whatever may have been its motives, did not originate
in that reciprocal tenderness, trust and esteem which
are the celestial cement of that state and the only
safeguards of its inviolacy and permanence. The an-
tipathies of this loveless union are reflected in the sub-
sequent conduct and behavior of the parties and caused
its dissolution on statutory grounds when it became
unendurable to both, as shown by the terms of a let-
ter written by the wife and by the oral statements of
the husband.

The important question is, what is a just and fair
provision, under the peculiar facts of this case, for the
maintenance of the wife and child committed to her
general custody? The respondent is a man of wealth,
none of it coming from his wife but all inherited from

his father, which consists chiefly of personalty, the realty owned by him being a negligible quantity; and, hence, affording little out of which the wife can be endowed if she survives her husband. In addition to her support, she is charged, under the decree below, with the custody and education of the child during her retention of its custody. The intolerable relations between the two parties preceding their divorce are sufficient reasons for the severance thereafter of all unnecessary dealing or association between them of a business nature or otherwise. This and other reasons influenced my opinion when this case was submitted in Division, that the alimony awarded should be in gross and permanent. On the reargument of the case in Banc, my conclusions have remained unaltered. The learned circuit judge thought plaintiff should receive $6000 per year for the maintenance of a respectable state and for the support and education of her child. My conclusion is she should receive for those purposes and as alimony in gross the sum of $100,000. The amount thus to be paid to the wife not to include the temporary alimony awarded during this appeal by the circuit court, which must be paid (if that has not been done) up to the time of the performance of this decree; nor to include the sum of $5000, which I think is a proper allowance to the plaintiff as suit money in prosecuting this case. The total amount herein awarded to her to be paid within thirty days after the rendition of this decree.

I think the judgment of the circuit court should be reversed and the cause remanded with directions to that court to enter judgment in conformity with this opinion.

## CONCURRING OPINION.

WALKER, J.—Those of us who think that this is not a case for alimony in gross, and who think that the statute lodges in the trial court a discretion as to

the character of alimony allowed, find that we are in the minority. In other words, a majority of the court is of the opinion that this is a·case for alimony in gross.

There are and were divers views upon the amount of alimony in gross which should be allowed. The sum of $100,000 was finally agreed upon by a majority as a reasonable allowance in gross. Inasmuch as the judgment *nisi* when properly commuted to a sum in gross would perhaps practically reach such sum, and in order to reach a judgment in this case (an exigency which seriously confronted the court) we, for the purpose of reaching some tangible judgment in the case, agree to said sum in gross in lieu of the judgment *nisi*, but at the same time adhere to our individual views, that under the record here, this is not a case for alimony in gross. We also agree that the present·judgment may be reversed and the cause remanded with directions to the trial court to enter up a modified judgment for the plaintiff, allowing her the sum of $100,000 as alimony in gross to cover the support of herself and child. *Graves* and *Faris, JJ.,* concur.

## DISSENTING OPINION.

GRAVES, J.—As some of our brothers have expressed a desire to adopt as their own views of this case the well-written opinion of our learned Commissioner BROWN, it devolves upon me to redraft my original dissent to conform to the present situation. Our commissioner has written well in this case. His opinion bespeaks research and thought, and abounds in figures of speech which reflect credit not only upon himself but upon the court of which he is a part and parcel. The feeling evinced for the gentler sex is admirably woven in the text, and of this we do not complain. But I do not concur in this opinion. I do not believe that a divorce suit is the time for adminis-

tering upon a man's estate. As stated in the opinion, alimony had its origin in provision for the wife during the separation of the two. Such provision was made suitable to their status in life. The court considered the status the couple occupied from a financial standpoint, and from other standpoints, and measured out to the wife the maintenance that would comport with that status. It may be that this early doctrine has been broadened to some extent, but it should not be broadened to the extent of administering upon the estate as if the man were dead. Such in effect is the doctrine announced in the opinion. Under that rule the woman can divide *one* man's estate, remarry and divide another's. The size of her private fortune is only limited by her ability to marry and dissolve the marriage. Even in the death of the husband our statute contemplates the lessening of the widow's rights upon her remarriage. The law as it is now written gives her a homestead for life, but it likewise takes from her this provision for her maintenance upon her remarriage. The policy of our State is therefore to lessen the rights of the widow upon remarriage and this policy is right. When she drops the deceased spouse's memory the dollars earned by the sweat of his brow should be dropped with it. We need not philosophize on this, however, because the public policy of the State is indicated by our statutory provisions.

Under the opinion the doctrine of partitioning a live man's estate is an overshadowing one, but there is another question that deserves notice. I think that under our statute it is discretionary with the trial court whether the alimony be allowed in gross or in installments, and I think further that this discretion should not be disturbed by this court, unless the record discloses an abuse of the discretion. This discretion is given the trial court, so that he may give effect to the circumstances surrounding each particular case.

In the case at bar we cannot as a court sanction much of the conduct of the defendant, but on the other hand there is some conduct of the wife that our commissioner excuses which I cannot excuse. I refer to the letter found in the dresser drawer, and set out in full in the opinion. My credulity has not reached such a pitch as induces me to believe the story of the wife that this letter was written to arouse the jealousy of the husband. Husbanded in cheap novels may be such ideas, but for a refined, educated and sensible woman to do an act of that kind does not strike me as it does the commissioner. I do not believe this story, as evidently the trial judge did not believe it, and this no doubt influenced his discretion in determining the character of the alimony to be allowed. Credulity is again strained when it is said that we cannot conclude whether "My Dear Pal" is of the masculine or feminine gender. The very face of the letter shows that it was addressed to a man. The circumstances of this letter alone justify the discretion exercised by the trial judge. Under the evidence before us we cannot say that the trial court abused the discretion granted by our statute, when he determined that alimony should be paid by installments, rather than in gross. If the yearly allowance is too small, which we do not concede, that does not convict the trial court of error in exercising his discretion as to the kind of alimony, but only goes to the amount.

But if the annual allowance made by the trial court is to be commuted from annual installments to an allowance in gross, then such allowance in gross should be reasonable, and there are many things which enter into that consideration. This wife never brought a dollar to the estate of the husband. To say that this woman can't live upon and maintain a respectable status in life upon what a member of this court receives for himself and his whole family is going to some length. If she is to have an absolute estate, for

her own use, it should only be such that the reasonable income therefrom would enable her to occupy a reasonable, refined and dignified station in life. Much of this, however, is by the wayside. In so commuting the installments into a gross sum we must not overlook several potent facts.

First, the decree of this court, nor of any court in this kind of proceeding, cannot exempt Mr. Lemp from the legal duty and obligation to support and educate his child. The wife may marry again and be influenced to cast this burden upon the husband. Mr. Lemp has no recourse, but must respond to the demands of the law, and pay for the support and education of this child, notwithstanding the fact that the decree imposed that duty upon the wife. This is a matter which should have serious consideration in commuting an annual alimony into a gross sum. In fact, remarriage alone is a potent factor to be considered. Such is the very spirit of Missouri laws. No right is more sacredly guarded than the widow's right to a homestead. It is a part of her allowance when the more solemn separation, occasioned by death, takes place. For a while it was guaranteed to her for life irrespective of what she might do as to future marriage. It is as much a part of her support and maintenance as is alimony in a divorce proceeding. It comes from a separation marked by tears and a throbbing and aching heart. It is the shelter for helpless hands and grief-stricken heart. If support and maintenance should ever be considered to have a sacred abode with the widow through life, the support and maintenance furnished by the homestead should be so classified. But such is not now the public policy of this great State, and to its public policy we, as its servants, should bow. Now, if the widow remarry and thereby choose another for her stay and support, the law says she must give up the support and maintenance furnished by the homestead. And why not? We need

not stop to answer. It is sufficient to us that such is the public policy of the State. This matter should be seriously considered in commuting alimony in install-·ments to alimony in gross. Does divorce add more sanctity to the situation than death? If the public policy of the State cuts off the widow's support when she remarries, should not such public policy enter into the law and be a matter of consideration in fixing alimony in gross? We think so. Other suggestions could be made but we desist. In my view of the law the judgment *nisi* should be affirmed, because there has been no violation of the discretion wisely lodged by the statute in the trial court. But if alimony is to be allowed in gross it should be in a reasonable sum, and not in the grossly excessive sum ($250,000) suggested by our commissioner.